## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CHARLES E. AMOS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-CV-0442-CVE-PJC** |
| | ) | |
| **CENTRILIFT, a division of Baker Hughes** | ) | |
| **Incorporated,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment and Combined Brief in Support (Dkt. # 43). In the amended complaint, plaintiff Charles E. Amos alleges that his former employer, Centrilift, discriminated against him because of his race, African-American, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"). See Dkt. # 20, at 4. Plaintiff alleges that Centrilift terminated him in retaliation for his complaints about racial discrimination and failed to remedy his racially hostile work environment, in violation of Title VII and 42 U.S.C. § 1981. See Dkt. # 20, at 4-5. Plaintiff also alleges that Centrilift's actions constitute intentional infliction of emotional distress. Id. at 6. Centrilift moves for summary judgment, arguing that there are no genuine issues of material fact.[1]

---

[1]    It is worth noting that it is difficult to discern whether facts are disputed when plaintiff's counsel uses the fact section of his brief to assert substantive arguments containing overly zealous interpretations of and vague references to allegedly disputed facts.

**I.**[2]

In December 1999, plaintiff began working as a mechanical assembler at Centrilift, a manufacturer of oilfield-related equipment, located in Claremore, Oklahoma.  Dkt. # 43, at 6; Dkt. # 55, at 5.  Plaintiff worked in the pump assembly department, an area of Centrilift's plant in which oil well pumps are assembled by teams of two or more mechanical assemblers.  Dkt. # 43, at 6.  Because pump assembly is a group task, teamwork is vital to Centrilift's operations and is one of Centrilift's "core values."  Id.

The Employee Handbook sets forth Centrilift's core values, disciplinary procedures, and hiring policies.  Among Centrilift's core values are integrity, teamwork, performance, and learning.  See Dkt. # 55-17, at 7.  The Employee Handbook discusses Centrilift's expected "Standards of Conduct" and states that employees are expected to behave "in a cooperative and pleasant manner while on company premises."  Id. at 9.  Conduct such as "[n]ot following established work safety methods and procedures," behaving in a manner that disrupts performance or other employees, violating safety procedures, "[i]nsubordination – [f]ailure to comply with instructions," using ethnic slurs, and violating fellow employees' civil rights, may result in disciplinary actions up to and including immediate termination (without the normal progressive disciplinary steps).  Id. at 9-10.  "Employees are encouraged to bring violations or suspected violations of the Company's Standards of Conduct to the attention of his [sic] . . . supervisor, Human Resources Management, or to report the matter through the . . . 'Speak-Up Program' as appropriate."  Id. at 10.

---

[2]      This statement of facts and the attendant analysis is what should have been contained in plaintiff's response to the motion for summary judgment.  This Court should not be expected to spend days combing the record to identify genuine issues of material fact.

Centrilift's normal disciplinary procedure consists of four steps.  <u>Id.</u> at 29.  First, an employee receives a "written verbal" warning from his supervisor.  <u>Id.</u>  Second, the employee receives a written warning, which is copied to human resources.  <u>Id.</u>  Third, the employee receives a final written warning with possible suspension, which is copied to human resources.  <u>Id.</u>  Fourth, the employee is terminated.  <u>Id.</u>  The Employee Handbook provides that "[b]efore any termination, the responsible supervisor must review the employee's file with the Human Resources department, and agreement must be reached on termination."  <u>Id.</u>

With regard to job opportunities and transfers, "Centrilift believes in promotion from within and growth for all capable employees."  <u>Id.</u> at 16.  The Employee Handbook provides that internal hiring is based on three factors: (1) the published minimum qualifications of the open position, (2) the applicant's interview with the supervisor, and (3) the length of service of the applicant, which serves as a tie-breaker when all other factors between candidates are equal.  <u>Id.</u>

In January 2004, while still employed, plaintiff initiated a lawsuit against Centrilift, alleging racial discrimination and harassment.  Dkt. # 43, at 6.  On March 25, 2005, plaintiff and Centrilift settled the lawsuit.  <u>Id.</u>  Plaintiff signed a confidential "Settlement Agreement and Full Release of Claims" and expressly agreed to a full, final, and complete release of all existing claims against Centrilift that arose out of plaintiff's employment with Centrilift.[3]  <u>Id.</u> at 7.  The Settlement

---

[3]      Therefore, plaintiff's citation to and reliance upon a supervisor's note from April 2004, <u>see</u> Dkt. # 55-13, is of no import to the Court's analysis.

Agreement did not provide that Centrilift would remove, redact, or disregard plaintiff's existing reprimands, performance reviews, and counseling records.[4]  Id.; Dkt. # 55, at 6.

Shortly before the March 2005 settlement, plaintiff received an overall positive performance review from his then supervisor, Gary Freet.  See Dkt. # 43-7, at 1.  The effective date of the review is February 27, 2005.[5]  Id.  Freet remarked, "Employee's Goals/Challenges: [plaintiff] has done a good job in the assembly of pumps" and "has been utilized to train new assigned assemblers during the last 6 months."  Id.  Freet noted, nevertheless, that plaintiff's "challenge during his next review period is to continue to mentor the younger assemblers and continue to build a strong team working environment."  Id.  Freet found that plaintiff met Centrilift's expectations for all skill sets and core value requirements.  See id. at 1-2.

### May – September 2005

In May 2005, Ray Phillips, who is Caucasian, became the manager over the pump assembly department.  Dkt. # 55, at 6.  The pump assembly department no longer had a supervisor, Dkt. # 55-3, at 9, so the manager also fulfilled many of the former supervisor's roles.  Plaintiff brought his workplace concerns to his manager.  Plaintiff told the manager that "there were times where he felt like race was an issue[,]" that "he hadn't been treated fairly in the past," that race played a role in decisionmaking, and that some people ignored plaintiff's complaints.  Id. at 24-26.  The manager testified that plaintiff had "several discussions [with him] over time" regarding race-related issues

---

[4]     While plaintiff believed that he was starting with a "clean slate" following the Settlement Agreement, he admits that his belief was not based on any representations by Centrilift.  Dkt. # 43, at 7.

[5]     Freet did not sign the review until March 8, 2005, however.  Id.

in the workplace, id. at 28, 36, but that plaintiff refused to provide any details about his allegations, see Dkt. # 43-2, at 2.

Nevertheless, the manager's handwritten notes document a discussion he had with plaintiff (at some point between May 2005 and January 2006) in which plaintiff described the "racist harassment" that "continue[d]."[6] Dkt. # 55-3, at 29-31; see Pl. Ex. D, at 2. The notes include names of specific coworkers and other key words, such as "lawsuit" and "racist comments * participated." Dkt. # 55-3, at 29, 32;  Pl. Ex. D, at 2. Among the individuals named by plaintiff as "racist" was Ron Phillips, the Caucasian "lead" pump assembler. Dkt. # 55-3, at 8-9, 33-34.

During the manager's deposition, he explained the meaning of his shorthand notes. The manager testified that plaintiff told him about his 2004 lawsuit against Centrilift. Id. at 29. Plaintiff stated that the racist harassment had continued since then but was sporadic. Id. at 30. The manager stated that some of the names in his notes were included as part of a "historical" perspective. Id. at 31-32. The manager discovered that, at some point in time, plaintiff had been asked to attend anger management classes. Id. at 32. The manager explained that "racist comments * participated" meant that plaintiff admitted to participating in derogatory conversations with his coworkers. Id. at 30-31.

As part of the manager's investigation into plaintiff's complaint, he spoke with the lead and concluded that the lead was not racist because he "ha[d] some participation in outside activities that tend[ed] to [indicate] . . . it was not a  concern." Id. at 34. The lead told the manager that one of his fishing buddies is African-American. Id. at 35. The manager advised the lead "to pay particular

---

[6]     The Court notes that this particular page of the manager's notes logically would have been taken during the July 2005 investigation after plaintiff called the lead "prejudiced," see discussion of the investigation infra, but no one raises this issue, and this particular note page has no date.

attention to activities during the day." Id. at 33.  The manager also spoke with other employees (including African-American individuals) who had worked with the lead.  Dkt. # 43-2, at 2.  According to the manager, the employees told the manager they "didn't see any actions that they were taking as being racial."  Dkt. # 55-3, at 33.  The manager concluded that his investigation did not reveal any information to support plaintiff's beliefs about the lead.  Id.

On May 24, 2005, Diana Dotolo, the area human resources manager for the manufacturing and supply chain divisions, met with plaintiff as required by the terms of the March 2005 Settlement Agreement.  Dkt. # 43-3, at 9.  She took notes at this meeting and noted that plaintiff told her "[s]ometimes people swell-up at him."  Id.  Dotolo asked plaintiff if he told his manager about this; plaintiff responded that his manager "just ignores it."  Id.  Plaintiff did not "think he kn[ew]."  Id.  Dotolo wrote that plaintiff felt "some people (didn't elaborate on who) don't like him because of his color."  Id.  Dotolo asked plaintiff how things were going with his new manager.  Id.  It is disputed whether plaintiff used the word "cool" to describe his new manager.  Compare id. with Dkt. # 55-4, at 10.

On June 9, 2005, the manager issued written warnings, copied to human resources, to plaintiff and a non-African-American coworker, Mark Trahan, for a Health Safety & Environmental ("HS&E") violation.  See Dkt. # 43-2, at 9-10; Dkt. # 60-4, at 4.  The manager issued the warnings because, according to him, he verbally instructed all mechanical assemblers, including plaintiff and Trahan, that they were not to assemble pumps by hand.  See Dkt. # 43-9, at 4.  Dotolo testified that she thought a second level written warning was appropriate because this HS&E violation was "very serious" and merited discipline outside of the normal disciplinary process.  Dkt. # 60-4, at 4.  According to the written warnings, plaintiff and Trahan failed to follow the manager's instructions

6

when they improperly installed "stage stacks." Dkt. # 43-9, at 4. The warnings stated that additional "incidents such as this will result in further disciplinary action up to and including termination of employment." Id. Each warning remained in effect for six months, and during that time, plaintiff and Trahan were expected to assemble stage stacks using the "power draw bench" and not by hand. Id. Both plaintiff and Trahan signed the warnings. See id. On the same day plaintiff and Trahan signed the warnings, the manager circulated a document for all employees in the pump assembly department to sign, attesting that they understood they were not to assemble pumps by hand. See Dkt. # 55-7; Dkt. # 43-9, at 4. The manager wanted to resolve any confusion about the new pump assembly procedure. See Dkt. # 43-9, at 4. Most of these employees signed the document between June 9 and 10, 2005. See Dkt. # 55-7.

The parties dispute whether plaintiff argued with his manager about the written warning before he signed it. Compare Dkt. # 43-2, at 3 with Dkt. # 43-6, at 6-7. Plaintiff claims he said he disagreed with the warning because there was no formal policy against "hand loading" pumps at the time of his write-up, and because plaintiff claims that he was merely overseeing Trahan, who was actually responsible for the improper assembly of the pump. See Dkt. # 43-6, at 6-7. A Caucasian mechanical assembler, Ronnie Morland, testified that it was standard practice, before June 9, 2005, to assemble pumps by hand. See Dkt. # 55-6, at 9-10. Morland did not work the same shift as plaintiff at that time. See Dkt. # 60-3, at 5.

On or about July 11, 2005, another incident occurred that resulted in plaintiff being disciplined. The parties dispute the facts surrounding this incident and the appropriateness of the subsequent final written warning given to plaintiff. According to the manager's affidavit, the lead told plaintiff and Robert Frew, a Caucasian coworker at plaintiff's table, that four pumps were "hot"

7

– meaning that they were to receive top priority in assembly.  Dkt. # 43-2, at 3-4.  The manager learned from the lead that plaintiff and Frew failed to follow the lead's instruction to build these pumps immediately.  Id. at 3.  Upon receiving this information, the manager investigated the incident.  Id. at 4.

The manager interviewed the lead and certain mechanical assemblers – including plaintiff, Frew, Trahan, Luke West, and Eric Hillsberry  – and obtained written statements.  See id. at 4, 11-19.  The record contains statements from all of these individuals except plaintiff.  See id.  Only one statement contains a date – July 27, 2005.  See id. at 17.  All of the statements contain discussions of plaintiff's mood swings, teamwork issues, and other various temper tantrums and outbursts with coworkers and junior assemblers.  See id. at 11-19.  The statements do not describe the alleged "hot pump" incident.  See id.  On Frew's statement, however, the manager wrote that "[t]he word 'hot' was used [b]y RON & heard by Robert Frew [a]nd [plaintiff] was there at that [t]ime[.]"  Id. at 15.  The manager stated in his affidavit that "Frew specifically told me that he had tried to start assembling the 'hot pumps,' but that Amos told him not to – that he (Amos) would take care of it."  Id. at 4.

According to the manager, "Amos [] called Ron Phillips 'prejudiced' during their confrontation over the 'hot pump' issue."  Id. at 5.  In the manager's notes, it appears he discussed the incident with Trahan.  See Pl. Ex. D, at 3.  Trahan told the manager that "Ron asked Charles if he had [a] problem because he had the parts for 1 pump – not the other 5."  Id.  In response, plaintiff allegedly told the lead he was "being prejudice[d] to [him]."  Id.  West and Frew corroborated plaintiff's alleged "prejudice" comment.  See id. at 5, 7.  Trahan also said that the lead told plaintiff he "doesn't [r]un this company."  Id. at 3.  Hillsberry affirmed Trahan's version of the incident.  See

id. at 4.  Hillsberry stated that the lead told plaintiff "I told you these were hot, what are you doing?" Id.  Plaintiff then said something to the lead, and the lead responded "You're going to [l]earn you don't run this place."  Id.  The manager also interviewed Frew, who said plaintiff was upset with the lead and was not going to build "the 39 P200 first" as instructed.  Id. at 7.  Frew reported that plaintiff said "I'm going to HR everytime [sic] there is something [I] do[] not like."  Id.  The manager testified that, at this time, he knew that some pump assemblers did not want to work with plaintiff, and that plaintiff did not want to work with them.  See Dkt. # 55-3, at 42.

Based on these findings and discussions with other employees, the manager claims he was unable to determine that plaintiff's comment that the lead was "prejudiced" against him was factual. Dkt. # 43-2, at 5.  The manager found that there was no evidence that plaintiff was "singled-out in the instruction to build the 'hot pumps[,]' because the lead "frequently assigned priority jobs to the other assembly table."  Id.  Further, the manager found that the witness statements revealed that plaintiff had serious teamwork problems.  Id. at 4.

The manager nevertheless continued his investigation.  Id. at 5.  In late July 2005, he was informed by Byron Maynard, an African-American employee from another department, that Cleo Simon, a non-African-American mechanical assembler, believed plaintiff was being treated differently than his Caucasian counterparts because of plaintiff's race. Dkt. # 55-3, at 39-41.  The manager spoke with Simon and took notes, which appear to be dated July 30, 2005.  Pl. Ex. D, at 1.  According to Simon, plaintiff "got the heat for a situation with himself and Craig Lowe."  Dkt. # 55-3, at 40.  Simon stated that plaintiff and the coworker "g[o]t into it and one [wa]s dealt with differently than the other."  Id.  The manager wrote "[f]rom Cleo's perspective [. . .] due to Charles [. . .] Doesn't see Any Favoritism From me[.]"  Id.  The manager claims that neither "Maynard nor

9

Simon had any complaints about 'prejudice' related to Ron Phillips and [plaintiff], and neither one had any additional information about the 'hot pump' issue." Dkt. # 43-2, at 5.

The manager also consulted with Dotolo.  See id. at 5; Dkt. # 43-3, at 3-4.  Dotolo and he discussed plaintiff's teamwork issues and inspected plaintiff's performance reviews from October 2002 through February 27, 2005.  See Dkt. # 43-3, at 22.  Although plaintiff obtained generally positive reviews, each review noted plaintiff's challenge to maintain or to continue improving his relationships with coworkers.  See id. at 10, 12, 14, 16, 18, 20.

The manager concluded that plaintiff and Frew had disregarded the lead's instructions, failing to build even one of the at issue pumps as instructed.  See Dkt. # 43-2, at 5-6.  According to the manager, "Amos and Frew had been supplied all of the parts needed to complete one of the 'hot pumps,' [and] [] the parts needed for the remaining three (3) 'hot pumps' were readily retrievable from the parts storage area . . . ."  Id.  Notwithstanding these findings, the manager believed that plaintiff was primarily responsible for the insubordination.  Id. at 6.  Frew was new to the department, was being trained by plaintiff, and had been allegedly instructed by plaintiff not to build the "hot pumps."  Id.  Therefore, the manager elected not to discipline Frew.

The next incident relevant to the Court's inquiry occurred in early September 2005.  Morland, who worked at plaintiff's assembly table, used the term "n*****-rigged" to describe a damaged tool.  See Dkt. # 43-15, at 2-3.  This instance was not the first time Morland used an ethnic slur, as he  admitted to calling an African-American the "N word" at least once before 2007.  Id. at 2.  According to Morland's version of events, plaintiff and Frew were present when Morland used the derogatory term.  Id.  Plaintiff told Morland he didn't like the word.  Id.  Morland claims he apologized to plaintiff, who in turn did not report the slur to management.  Id.  Morland did receive

10

a written warning for the slur, however, because Frew soon told the lead about Morland's utterance. Morland testified that "Bob Frew was outside in a smoke area on break and was laughing about [the term], and the lead man said, 'I've got to write him up for that.' So when they came back, I got wrote up." Id.

The written warning, dated September 14, 2005, states that Morland violated Centrilift's Standards of Conduct by using an "ethnic slur in conversation." Dkt. # 55-10, at 1. The warning instructs Morland that "[f]urther incidents such as this will result in further disciplinary action up to and including termination of employment." Id. The warning also instructs Morland to discontinue his use of "degrading Ethnic comments while on company property." Id. The warning, which was copied to human resources, appears to be signed by the manager and initialed by a "DD" on September 16, 2005. Id. Plaintiff admits that he did not hear Morland use the ethnic slur again. Dkt. # 55, at 14.

Six days later, on September 20, 2005, the manager and Dotolo met with plaintiff to issue a final disciplinary warning. Dkt. # 43-3, at 4. The manager decided to issue a final written warning to plaintiff in light of the "numerous prior counseling sessions wherein Amos had been told to improve his teamwork, combined with the large number of highly disturbing reports from others in the area regarding Amos' behavior and attitude." Dkt. # 43-2, at 6. Dotolo agreed with the manager's decision and prepared the final written warning per his request. Id.; Dkt. # 43-3, at 4. Because plaintiff had no prior written warnings for teamwork issues, see Dkt. # 55-3, at 43, the final written warning was based, in part, on plaintiff's six performance reviews from October 2002

through February 2005.[7]  Dkt. # 43-2, at 6.  The manager stated that he intended the final warning to provide plaintiff with a last chance to correct his teamwork problems, as well as clearly set forth Centrilift's expectations.  Id.

The final written warning, signed by the manager and Dotolo, lists two primary grounds for plaintiff's discipline: (1) his failure "to build a hot pump" as instructed by his lead, and (2) his recurrent teamwork issues with his coworkers.  See Dkt. # 43-11.  The warning states that "[a]s a result of our investigation into the incident between you and Ron Phillips on 07/11/2005, we learned that we still had teamwork issues relative to you and your coworkers." Id. at 1.  The warning states that plaintiff's coworkers felt "harassed" by him, and that "it [wa]s a very uncomfortable work environment."  Id.  The warning summarized coworkers' feedback about plaintiff:

> You have yelled at them, telling them to work faster; you have yelled and gotten angry with them for asking other people in the department questions about how to do the work – telling them they are supposed to listen to you and your way is the only right way; co-workers must 'tip-toe' around you in the morning because you frequently arrive to work in a 'bad mood' and chew them out; if someone moves to the other work bench, you question their loyalty and give them the silent treatment.

Id.  The warning also summarized the previous discussions management had with plaintiff during the six relevant performance reviews.  See id.  The warning informed plaintiff, "You have been constantly reminded that you must focus on building positive working relationships with your peers and new employees that you may train; this includes utilizing patience and using a diplomatic approach with trainees as they are learning our processes."  Id.  The warning outlined Centrilift's expectations.  Plaintiff was to stop creating a "hostile work environment" for his coworkers.  Id. at 2.  Plaintiff was to behave in a manner conducive to building a team environment, i.e., ceasing

---

[7]      The reviews note plaintiff's need to maintain or to continue developing his teamwork skills. See Dkt. # 43-3, at 10, 12, 14, 16, 18, 20.

behavior such as giving coworkers the silent treatment, commenting in an unwelcome manner, and failing to assist others.  Id.  The warning stated that it was a permanent disciplinary action that would not be removed from plaintiff's file.  Id. at 1.  Centrilift would not tolerate "[a]ny further incidents of this type of behavior," which would result in immediate termination.  Id.

Plaintiff refused to sign the final written warning.  See id. at 2.  Plaintiff claims he did not agree with the final written warning because (1) he did not hear the lead's instruction regarding the hot pumps; and (2) he did not have sufficient parts to build the pumps.  See Dkt. # 43-6, at 8-9. Dotolo's handwritten note states that plaintiff said  the lead was not giving him "all the information." Dkt. # 43-11, at 2.  Dotolo also wrote that plaintiff said he did not refuse to build the hot pump.  Id. Plaintiff did not challenge the criticisms about his teamwork issues.  See id.; Dkt. # 43-6, at 8-9.  To the extent plaintiff claims he did not understand the consequences of the warning because of his limited reading abilities,  see Dkt. # 43-6, at 10, Dotolo avers that both she and the manager "mentioned to Amos . . . that any additional problems with hostile behavior toward co-workers could lead to immediate discharge."  Dkt. # 43-3, at 5.

### January – August 2006

In January 2006, the pump assembly department received a new supervisor, Erico Zetina, who reported directly to the manager.  Dkt. # 57-2, at 1.  In March 2006, plaintiff met with the supervisor to discuss his annual review and pay adjustment.  Id. at 2; see Dkt. # 55, at 10.  As part of this annual review, plaintiff received a standard, step pay increase from $17.00 per hour to $17.50 per hour.  Dkt. # 43-6, at 10.  Plaintiff did not receive a merit increase, however, because he did not have a "clean record."  Dkt. # 57-2, at 3.  Plaintiff's June 2005 written warning and September 2005 final written warning disqualified him from being eligible for a merit increase.  Id.; Dkt. # 43-6, at

13

11. Plaintiff admits that he does not know of any other employee who had two write-ups but still received a merit increase.  See Dkt. # 43-6, at 11.  The supervisor stated that, during the same period, a Caucasian employee with two write-ups for HS&E violations did not receive any merit increase. Dkt. # 57-2, at 3.  Similarly, Trahan, who had one HS&E violation on file, received only half of his proposed merit increase.  Id.  The record contains no written documentation from the March 2006 annual review.

On April 19, 2006, plaintiff applied for an open mechanical assembler position in the premium models department.  Dkt. # 43-13, at 1.  The open mechanical assembler position had the same salary, shift, and benefits as plaintiff's assembler position in pump assembly.  Dkt. # 57-2, at 3.  Plaintiff described the position as "the same job, doing the same thing, but on a bigger scale." Dkt. # 43-6, at 13.  The supervisor claims that he ultimately chose Kenny Ritter, a Caucasian employee plaintiff "trained to build a pump," id., because Ritter had prior experience assembling similar products and had been a test technician in the past, Dkt. # 57-2, at 3.  The supervisor felt that these experiences and skills made Ritter the better candidate.  Id. at 4.  Plaintiff admits that he knows nothing about Ritter's work experience and skills.  See Dkt. # 43-6, at 13.

On May 25, 2006, plaintiff applied for a production test technician position, which opened as a result of Ritter's transfer to the premium models department.  Dkt. # 43-14, at 1; Dkt. # 43-6, at 14.  The open production test technician position had the same salary, shift, and benefits as plaintiff's mechanical assembler position.  Dkt. # 57-2, at 4.  The supervisor states that plaintiff was one of three finalists for the position.  Id.  Plaintiff testified that he applied for the position because he was "the next man in line," in terms of seniority, to go to that department.  Dkt. # 43-6, at 14. Plaintiff believed he was the next man in line because, at some point in the past, Tad Bolin, the plant

14

manager, told him that Centrilift gave preference to more senior employees.  Id.; see Dkt. # 55-3, at 7.  Plaintiff admits, however, that he told his supervisor during the interview that he applied for the position just to prove he wouldn't get the job.  Dkt. # 43-6, at 13.

The supervisor prepared a comparison chart detailing the qualifications and experience levels of the three candidates.  Dkt. # 57-2, at 7.  Ultimately, the supervisor selected Hillsbury, a Caucasian mechanical assembler, to fill the position.  Id. at 4.  The supervisor stated that, although Hillsbury and plaintiff had virtually the same amount of experience and tenure at Centrilift, the supervisor felt that Hillsbury was the better candidate because he had certain skill sets that plaintiff did not possess. Id.  Hillsbury had "OK" depth micrometer usage, had "Basic" electrical knowledge, and knew how to use Excel software.  Id. at 7.  Plaintiff, on the other hand, had no depth micrometer usage or electrical knowledge and had stated in a previous interview that he had only basic knowledge of Excel.  Id.

The next incidents relevant to the Court's inquiry occurred in mid-July 2006.  The parties do not dispute that two "sheet incidents" took place; they dispute instead the chronology and key facts relating to these events.  Centrilift's evidence is not entirely consistent as to what occurred and when it occurred.[8]  Compare Dkt. # 43-20 and Dkt. # 55-11, at 1, with Dkt. # 43-21 and Dkt. # 43-10, at 3.  Therefore, for purposes of summary judgment only, the Court defers to plaintiff's version of events when the material facts differ.

The first sheet incident occurred on Wednesday, July 12, 2006.  Dkt. # 55-11, at 1.  Plaintiff testified that Bobby Cook, a Caucasian coworker at plaintiff's table, came running through the pump

---

[8]     For example, defendant's evidence refers to the white garments as "sheets," see Dkt. # 43-21; Dkt. # 55-11, at 1, "towels," see Dkt. # 43-20, and in one description, Styrofoam packing sheets, see Dkt. # 43-15, at 8.

assembly area, waiving his hands, yelling "wooooh", and wearing a white cape, white diaper-like shorts, and a Styrofoam cone on his head.  <u>See</u> Dkt. # 55-4, at 19-25.  The cape and diaper were made of white sheets[9] and the cape had writing on it.  <u>See</u> <u>id.</u> at 19-20.  Plaintiff then overheard Cook telling Morland, who (by then) worked at plaintiff's table, that Morland had missed seeing Cook's stunt.  Dkt. # 43-18, at 1.  Plaintiff admits that the lead, the manager, and the supervisor did not witness Cook's conduct.  Dkt. # 43-6, at 19.  Plaintiff did not report the incident that day because, he claims, he was waiting for his supervisor to raise the issue.  <u>Id.</u>

The record is unclear as to when the supervisor actually learned of Cook's donning of the white sheets.  The manager testified that the supervisor told him about the incident within a few days of its occurrence.  <u>See</u> Dkt. # 43-9, at 5.  The supervisor claims that plaintiff told him about the incident on July 27, 2006, saying Cook claimed he was acting like Superman.  <u>See</u> Dkt. # 55-11, at 1.  Plaintiff avers that he told his supervisor about the incident on the same day he wrote his letter to the president of Centrilift.  Dkt. # 43-6, at 19.  The letter is dated July 31, 2006.  Dkt. # 43-18, at 1.

The second sheet incident also occurred on Wednesday, July 12.  <u>See</u> <u>id.</u>; Dkt. # 55-4, at 26.  Shortly after Cook's stunt, Morland draped a white sheet over his shoulders and walked about the pump assembly area.  Dkt. # 43-10, at 3; Dkt. # 43-21, at 1; Dkt. # 55-4, at 26.  According to the supervisor, the lead witnessed Morland "coming from the motor assembly area 'wearing' one of the white sheets . . . as a cape.  Ron said he saw Charles Amos staring at [Morland] and telling [Morland] something."  Dkt. # 55-11, at 1.  At some point, the lead expressed concern to the

---

[9]      Centrilift employees use white sheets to clean pump housings.  Dkt. # 55-11, at 1; Dkt. # 55-4, at 21.

supervisor about Morland's donning of the white sheet because it could be associated with the racist group, the Ku Klux Klan.  Id.  The supervisor later called Morland into his office and asked Morland about the incident.  Id.  The supervisor specifically inquired if plaintiff was offended by the sheet.  Id.; Dkt. # 55-4, at 28.  Morland said no.  Dkt. # 55-11, at 1.  Morland told the supervisor that he was only acting like Julius Ceasar.  Dkt. # 55-4, at 28.

After Morland left the supervisor's office, Morland asked plaintiff to go along with his Julius Ceasar story.  Id.  Plaintiff claims he then told Morland he "needed to be careful with that kind of stuff, because he and [sic] already gotten wrote up for using the N word."  Id.  Plaintiff claims he waited exactly two weeks and one day for his supervisor to come and speak with him about the incident.  Id.; cf. Dkt. # 55-11, at 1.  He did not.  Dkt. # 55-4, at 28.  Accordingly, plaintiff went to his supervisor's office and demanded to speak to the president of the company about the sheet incidents.  Dkt. # 55-11, at 1.  Plaintiff claims that the supervisor then lied, telling plaintiff that he had already spoken with him about the issue.  Id.  Morland was not reprimanded for his donning of the white sheet.  Dkt. # 43-15, at 6.

On  Monday, July 17, 2006, Morland complained to the manager that plaintiff had arrived at work at 5:00 a.m. in an angry mood and was refusing to help Morland and Cook.  Dkt. # 43-16, at 1.  Morland told the manager that he found "it difficult to second guess [him]self and keep Charles from loosing [sic] his temper or arguing over nothing."  Id.  The manager asked the supervisor to investigate the situation to determine whether disciplinary action was appropriate.  Dkt. # 43-2, at 7.

On Thursday, July 27, 2006, the supervisor asked Morland to give a written statement "on what had been happening during the last two weeks."  Dkt. # 55-11, at 1.  The supervisor also asked

Cook to do the same.  Id.  He then typed statements, based on Morland's and Cook's accounts, for the two men to sign.  Id.; see Dkt. # 43-16.  The supervisor claims that after he came back from lunch, plaintiff came to his office and asked him to schedule an appointment with human resources so that plaintiff could discuss the sheet incidents.  Dkt. # 55-11, at 1.  Later that day, plaintiff returned to his supervisor's office and said he wanted to speak with the president of Centrilift.  Id.  During this second office visit, the supervisor asked plaintiff about "what was happening on his table[,] that there were teamwork issues."  Id.

On July 28, 2006, the supervisor and the lead held a meeting with plaintiff, Morland, and Cook, wherein the supervisor advised the group that he "expected them to work as a team."  Dkt. # 43-6, at 17; Dkt. # 43-17.  The supervisor told the group that if someone was caught up with his assignment, then he expected this person "to go and help the other two in their assignments."  Dkt. # 43-17.  He further told the group that he "[k]new there were some issues in [sic] their table but [he] wanted to remind them that their personal issues needed to be left out of the work place . . . ."  Id.  The supervisor asked each of the men to "treat each other with respect."  Id.  That same day, Morland signed a typewritten statement documenting his version of his sheet incident and describing plaintiff's "racial tendencies," anger issues, use of the term "Uncle Tom," dislike of the Claremore police department, and manipulative behavior.  Dkt. # 43-21.  On July 31, 2006, the supervisor and the lead signed a typewritten statement documenting their July 28th meeting with plaintiff, Morland, and Cook.  See Dkt. # 43-17.

Also on July 31, 2006, plaintiff wrote his letter to the president of Centrilift, which plaintiff testified the supervisor "told [him] to write . . . ."  Dkt. # 43-6, at 19.  Plaintiff's letter describes his version of the exchange that occurred the morning of July 17, 2006.  See Dkt. # 43-18.  According

18

to plaintiff, Morland told the lead that the problem at the table was "something about . . . a black thing." Id.  Plaintiff responded that he "did not want to here [sic] that." Id.  Plaintiff told the lead he was tired of Morland and Cook "using the black thing to try to get their way, and to put what's happening on [him] and take it off of them." Id.  Plaintiff claims he told the lead that if the plant manager "would have stopped this mess six years ago instead of letting it go on, they would not be able to use this to try to turn the table against [plaintiff]." Id.  The letter then describes Morland's and Cook's tendencies to ask for help but not give assistance in return. See id.  The letter concludes by describing the sheet incidents, Morland's use of the "N word," and management's selective response to employee complaints and disregard of plaintiff's concerns. See id.  The letter does not explicitly include the words "racial discrimination." Dkt. # 43-6, at 23.

In late July and early August 2006, Dotolo held meetings with individuals from the area. Dkt. # 43-3, at 5.  On August 4, 2006, Dotolo and Kelli Sellers, a human resources representative, met with plaintiff regarding his letter to the president of Centrilift. Id. at 5, 24.  Sellers took notes during the meeting and "portions" of her notes are included in the record. Id. at 5, 24-41.  Sellers' notes describe plaintiff's version of the sheet incidents, management's failure to respond to plaintiff's complaints, and plaintiff's teamwork issues. See id. at 24-29.  Plaintiff told Dotolo about his coworkers requesting his help but not wanting to help him in return, see id. at 27-29, and about his submission of "some letter to EEOC," id. at 25.  Plaintiff does not deny that he told Dotolo "they don't help me, and so why should I have to help them." Dkt. # 43-6, at 28; see Dkt. # 43-3, at 29.  Dotolo reported her findings to the manager, Ray Phillips. Dkt. # 43-2, at 7.

Ray Phillips decided that the entire group – plaintiff, Morland, and Cook – was to blame for the teamwork problems. Id.  Ray Phillips believed that Morland and Cook were willing to correct

19

their issues, however, while plaintiff was not.  Id.  Based on the August 4th interview, plaintiff was

not willing to help others if he did not feel they were willing to help him.  Id.  Ray Phillips testified

that he was neither aware of the details of plaintiff's 2004 lawsuit nor in actual possession of

plaintiff's July 31, 2006 letter at the time he made his decision.  Dkt. # 43-9, at 3, 6.  In response to

a question whether the manager had ever received a copy of plaintiff's letter, the manager simply

testified "I don't recall seeing [the letter]."  Id. at 6.  He did not state that he had no knowledge of

the letter or its contents.  See id.

On August 14, 2006, the supervisor, Zetina, issued Cook and Morland written warnings,

which were copied to human resources.  See Dkt. # 43-19; Dkt. # 43-20.  Cook's warning stated that

he was being disciplined for two infractions: "Horse Play/Disruptive Behavior" and "Teamwork."

Dkt. # 43-20.  The warning described Cook's disruptive behavior as "[r]unning around the two

tables in pump assembly area wearing a towel on your shoulders and towel made into underwear,

making flying noises; and then an [sic] 2nd incident of wearing a Styrofoam block on your head."

Id.  As to Cook's teamwork infraction, the warning stated that "[a]s a result of our investigation into

the incident [sic] occurred on July 17, 2006 at the assembly table . . . we learned that you have

teamwork issues relative to helping the other employees assigned to that assembly table."  Id.

Coworkers' feedback indicated that Cook was not prompt to help his coworkers when he had time,

that he paced himself in assigned tasks to preclude assisting coworkers, and that he engaged in other

activities instead of helping his coworkers.  Id.  The warning advised Cook that "[f]urther incidents

such as this will result in further disciplinary action up to and including termination of employment."

Id.  Morland's warning was identical to Cook's except that Morland's warning listed only a

teamwork infraction.  See Dkt. # 43-19.  Morland's warning did not mention his donning of the

white sheet.  See id.  Both warnings were initialed by a "DD" and signed by the supervisor.  See Dkt. # 43-19; Dkt. # 43-20.

Plaintiff also was disciplined on August 14, 2006.  See Dkt. # 43-6, at 21.  The manager, Ray Phillips, and Dotolo met with plaintiff and told him he was being terminated for his teamwork issues.  Id.  The manager decided to terminate plaintiff because his conduct violated his September 2005 final written warning, and because he was not willing to correct his teamwork issues.  Dkt. # 43-2, at 7.  Dotolo agreed with the manager's decision.  Dkt. # 43-3, at 6.  Plaintiff did not receive a final write-up documenting the grounds for his termination.[10]  Dkt. # 43-9, at 6.

Since plaintiff's discharge, he has raised two additional instances he believes evidence racial discrimination.  Plaintiff claims that Caucasian coworkers ridiculed him for his inability to read, and that they commented that most black people from Mississippi didn't know how to read.  Dkt. # 43-6, at 24.  Plaintiff admits that most of these alleged comments occurred before the March 2005 Settlement Agreement.  See id. at 25.  Nevertheless, plaintiff claims that Hillsbury made one similar comment during a safety meeting near the end of his employment.  See id.  The alleged comment occurred outside the presence of the lead, the supervisor, and the manager.  See id.  Plaintiff admits that he did not complain to anyone about Hillsbury's comment.  See id.

Plaintiff also claims that Morland "and them" frequently called him "boy."  Id.  Plaintiff claims he told them the term bothered him.  Id.  Plaintiff testified that he would respond, "How old do I have to be to be a man[?]"  Id.  Plaintiff admits, however, that he does not know whether his coworkers addressed Caucasian men as "boys."  Id.  Plaintiff further admits that he did not raise this

---

[10]     Dotolo testified that Centrilift does not issue final disciplinary reports "in every instance," and that verbal explanations are sometimes given in lieu of final write-ups.  Dkt. # 60-4, at 5.

issue with management because, according to him, every time he complained, "it [would] always turn out to be me."  Id.

Plaintiff filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 18, 2007.  See Def. Ex. W.  The Charge alleges racial discrimination and retaliation and lists August 14, 2006 as the latest date on which the discrimination occurred.  Id.  Plaintiff filed this suit on August 14, 2007.  See Dkt. # 2.  Plaintiff claims that he has suffered emotional distress as a result of the alleged racial harassment at Centrilift, including lost sleep, embarrassment, and arguments with his wife.  Dkt. # 43-6, at 26.  Plaintiff admits that he never received any medical treatment or prescription medications for his alleged emotional distress.  Id. at 27.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Title VII makes it "an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 provides that equal rights shall be given to "[a]ll persons within the jurisdiction of the United States."  Id. § 1981.  In cases involving racial discrimination, the elements of plaintiff's case are the same whether that case is brought under § 1981 or Title VII.  Carney v. City and County of Denver, ___ F.3d ___, 2008 WL 2838134, at *3 (10th Cir. July 24, 2008).

### A.  Race Discrimination

If an employee has no direct evidence of discrimination, he must prove his claim using the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792,

23

802-03 (1973); see Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).

Under this framework, the employee first must establish a prima facie case of discrimination.

McDonnell Douglas, 411 U.S. at 802.  Once the employee presents a prima facie case, the burden

shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse

employment action.  Id. at 803; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981);

English v. Colorado Dep't of Corrs., 248 F.3d 1002, 1009 (10th Cir. 2001).  If the employer makes

this showing, the burden shifts back to the employee to show that the employer's stated

nondiscriminatory reason is mere pretext for unlawful discrimination.  Riggs v. AirTran Airways,

Inc., 497 F.3d 1108, 1114-15 (10th Cir. 2007); Rivera v. City & County of Denver, 365 F.3d 912,

920 (10th Cir. 2004).

Here, plaintiff claims that Centrilift discriminated against him on three separate grounds.

See Def. Exs. V-W.  Plaintiff claims that the denial of his March 2006 merit increase constitutes a

discriminatory pay raise denial.  See Dkt. # 55, at 26; Def. Ex. V.  Plaintiff claims that the selections

of Ritter and Hillsbury for the open mechanical assembler position and production test technician

position constitute discriminatory hiring.  See Def. Exs. W.  Finally, plaintiff claims that his

termination of employment constitutes discriminatory discharge.  See Dkt. # 55, at 26.

1.  Prima Facie Case

Depending on the factual basis of a discrimination claim, one of two prima facie standards

apply.  In cases involving discharge, plaintiff must show that he (1) belongs to a protected class; (2)

was qualified for the position; and (3) was discharged despite his qualifications.[11]  Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002); see Green v. New Mexico, 420 F.3d 1189, 1192 n. 3 (10th Cir. 2005); Kendrick, 220 F.3d at 1229.  In cases involving other actions by the employer, plaintiff must show "(1) that plaintiff belongs to a protected class; (2) that he suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination."  Hysten, 296 F.3d at 1181 (internal quotation marks and citation omitted).  Regardless of which elements apply, "the critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination."  Kendrick, 220 F.3d at 1227 (internal quotations marks and citations omitted).  Plaintiff must raise only an inference of discrimination and need not dispel the nondiscriminatory reasons subsequently proffered by defendant.  EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1193 (10th Cir. 2000).  If plaintiff establishes a prima facie case, a presumption of discrimination arises.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Here, the Court finds that plaintiff has established a prima facie case for discriminatory discharge.  First, plaintiff, as an African-American, belongs to a protected class.  Second, Centrilift

---

[11]     This Court recognizes that the Tenth Circuit is split as to whether a fourth element, namely, that plaintiff's position was not thereafter eliminated, is required.  See Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1166 n.8 (10th Cir. 2007); see also Antonio v. Sygma Network Inc., 458 F.3d 1177, 1183 n.3 (10th Cir. 2006); Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005); Kendrick, 220 F.3d at 1229.  Swackhammer noted, however, that in a discriminatory discharge case, if the employer fired the employee because of unsatisfactory conduct, "the status of the employee's former position after his or her termination is irrelevant."  493 F.3d at 1166 n.8 (internal quotation marks and citation omitted).

terminated his employment.  Third, plaintiff was qualified for his position by reason of training and experience.

The Court finds that plaintiff has not, however, established a prima facie case with regard to his other proffered grounds for discrimination.  Plaintiff has not shown that Centrilift's denial of his March 2006 merit increase creates an inference of discrimination.  The Tenth Circuit has held that "[a] person alleging a Title VII wage discrimination claim must show, as part of his prima facie burden, that he was paid less, or given a lesser raise, than other similarly situated non-protected class employees."  Amro v. Boeing Co., 232 F.3d 790, 798 (10th Cir. 2000).  Plaintiff admits that he does not know of any other employee who – like himself – had two write-ups on file, but who – unlike himself – still received a merit increase.  See Dkt. # 43-6, at 11.  Moreover, there is undisputed evidence that Centrilift denied merit increases during the same period to other non-African American employees with write-ups on file.  See Dkt. # 57-2, at 3.  Therefore, the Court finds that plaintiff's discriminatory wage claim necessarily fails, as plaintiff cannot satisfy the third element of his prima facie case.

Plaintiff also has not shown that Centrilift's denial of his two transfer requests constitutes adverse employment action.  In Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998), the Tenth Circuit found that a plaintiff's failure to receive an applied-for position did not constitute an adverse employment action because the sought-after position paid the same salary, offered the same benefits, and involved substantially similar duties as the position the plaintiff held. The court noted that "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer adverse employment

action." Id. at 532 n.6.  The present case is no different.  Plaintiff applied for two positions that offered the same salary, shift, and benefits as the position plaintiff held.  See Dkt. # 43-6, at 13; Dkt. # 57-2, at 4.  While the Court acknowledges that the sought-after positions may have entailed somewhat different duties, these duties were not so different as to constitute significant changes in the conditions of plaintiff's employment.  Therefore, the Court finds that plaintiff's discriminatory transfer claim necessarily fails, as plaintiff cannot satisfy the second element of his prima facie case.  Only plaintiff's discriminatory discharge claim remains.

2.  Legitimate, Nondiscriminatory Justification

At this stage, the employer need not rebut evidence presented under the first step; it must only rebut the inference that it acted out of discriminatory animus.  E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1318 (10th Cir. 1992).  The ultimate burden of proving discrimination remains at all times on plaintiff.  Burdine, 450 U.S. at 253.  "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion."  Flasher, 986 F.2d at 1316 (emphasis added).  If defendant carries its "exceedingly light" burden of production, Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165 (10th Cir. 2007), the presumption of discrimination drops out of the case, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).

The Court finds that Centrilift has offered legitimate, nondiscriminatory reasons for plaintiff's termination.  Centrilift claims that the combination of plaintiff's September 2005 final written warning and his statement that he was unwilling to help his coworkers justified termination.

At this stage in the analysis, Centrilift must proffer only a <u>facially</u> nondiscriminatory reason for its decision.[12]  <u>Flasher</u>, 986 F.2d at 1316.  For example, "an employer could not advance as the reason for more seriously disciplining the plaintiff that he or she was black."  <u>Id.</u> at 1316 n.4.  Centrilift did not do so; thus the Court finds that the burden now shifts to plaintiff to show that Centrilift's proffered nondiscriminatory reason is mere pretext for unlawful discrimination.

3.  Pretext

To show pretext, plaintiff must produce evidence that would, if believed by the trier of fact, show that the true reason for the action was discriminatory.  Plaintiff may produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1323 (10th Cir. 1997).  Plaintiff can demonstrate pretext by showing that: (1) defendant's stated justification for the adverse employment action is unworthy of credence; or (2) plaintiff was treated differently than a similarly-situated, non-protected employee who committed an offense of comparable seriousness.  <u>Swackhammer</u>, 493 F.3d at 1167-68; <u>Kendrick</u>, 220 F.3d at 1230.  While "all doubts concerning pretext must be resolved in plaintiff's favor, [plaintiff's] allegations alone will not defeat summary judgment."  <u>Morgan</u>, 108 F.3d at 1324.  To defeat summary judgment, plaintiff must offer more than "[m]ere conjecture that

---

[12]  As this Court has previously advised plaintiff's counsel, <u>see</u> <u>e.g.</u>, <u>Maston v. St. John Health Sys., Inc.</u>, No. 06-CV-0694-CVE-FHM, 2008 WL 295815, at *5 (N.D. Okla. Jan. 30, 2008), this prong of the <u>McDonnell</u> <u>Douglas</u> framework <u>does</u> <u>not</u> <u>address</u> the veracity of defendant's proffered justification.  Therefore, plaintiff's arguments challenging the legitimacy of Centrilift's proffered justification are misplaced.  <u>See</u> Dkt. # 55, at 22-26. Such arguments go to pretext.

the employer's explanation is pretext." Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

Here, plaintiff challenges Centrilift's proffered justification on both credence and differential treatment grounds.  Plaintiff claims he was not insubordinate in relation to the "hot pump" incident that precipitated his September 20, 2005 final written warning and indirectly led to his termination. See Dkt. # 55, at 23.  Plaintiff also claims that Centrilift's "deviation from their [sic] 'progressive discipline' procedure" and the "disparate manner" in which Centrilift treated plaintiff and similarly-situated employees raise an inference of pretext.  Id. at 28-29.

a.  Credence

Plaintiff may demonstrate falsity in defendant's proffered justification "by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."  Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)).  The Tenth Circuit has held that "the factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions – simply disbelieving the employer is insufficient."  Young v. Dillon Cos., 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1111 (10th Cir. 2005)) (internal quotation marks omitted) (emphasis in original).  The relevant question is not whether defendant's proffered justification is "wise, fair or [even] correct," but whether defendant "honestly believed those reasons and acted in good faith upon those beliefs."  Id. (internal quotation marks and citation omitted).  A pretext challenge requires a court "to look at the facts as they appear[ed] to the person [who] ma[de] the decision to terminate plaintiff."  Kendrick, 220 F.3d at 1231.  A court's "role is

29

to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." <u>Young</u>, 468 F.3d at 1250.

Here, the Court finds that plaintiff has not proffered sufficient evidence to undermine the credence of Centrilift's proffered justification.  At the outset, the Court notes that plaintiff's dispute of the facts surrounding the "hot pump" incident is immaterial to the analysis.  While the "hot pump" incident may have precipitated the July 2005 investigation and September 2005 final written warning, the "hot pump" incident did not factor into the manager's ultimate decision to terminate plaintiff.  <u>See</u> Dkt. # 43-2, at 7.  Plaintiff's lack of teamwork skills – not insubordination – led to his discharge.

Plaintiff did not dispute his teamwork issues at the time of his final written warning or during his deposition.  <u>See</u> Dkt. # 43-11, at 2; Dkt. # 43-6, at 8-9.  In August 2006, he stated to Dotolo that "they don't help me, and so why should I have to help them."  Dkt. # 43-3, at 25.  The record contains numerous employee statements attesting to plaintiff's severe teamwork problems.  <u>See</u> Dkt. # 43-2, at 11-19; Dkt. # 43-16; Dkt. # 43-21.  It also contains six performance reviews dating as far back as October 2002 that corroborate, albeit in a constructive manner, plaintiff's lack of patience, tact, and/or general teamwork skills.  <u>See</u> Dkt. # 43-3, at 10-23.  The Court has no doubt, based on the record, that the manager honestly believed that plaintiff had serious teamwork problems when he terminated plaintiff.  In sum, this Court's role is not to second guess employers' honestly held (even if erroneous) business judgments.  <u>Young</u>, 468 F.3d at 1250.  The Court concludes, therefore, that plaintiff has not established a genuine issue of material fact as to the veracity of Centrilift's proffered justification.

30

b.  Differential Treatment

Plaintiff may also demonstrate pretext by providing evidence that he "was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." Kendrick, 220 F.3d at 1232.  Employees qualify as similarly-situated "if the employee[s] deal[] with the same supervisor and [are] subject to the 'same standards governing performance evaluation and discipline.'" Id. (quoting Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997)).  Similarly-situated employees should share "relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006); see Green, 420 F.3d at 1194.

Here, plaintiff argues that Centrilift's unexplained deviation from its progressive discpline policy raises an inference of pretext.  Plaintiff challenges his June 2005 written warning.  He argues that Centrilift unfairly disciplined Trahan and him for assembling pumps by hand because, up to that point, such an assembly procedure was common practice.  See Dkt. # 55, at 23.  Plaintiff also challenges his September 2005 final written warning that led, in part, to his termination.  He argues that the final written warning was not warranted because, up to that point, plaintiff had no previous warnings for teamwork problems.  See Dkt. # 55, at 24, 27-28.  In sum, plaintiff contends that even if he had teamwork issues, Centrilift wholly ignored its progressive discipline policy.  Id. at 24.

As to the June 2005 incident, the Court finds that plaintiff has not raised an inference of discrimination.  The manager disciplined both plaintiff and Trahan, a non-African-American employee, for their improper assembly of the pumps.  The fact that plaintiff was among the first employees written-up for the violation is irrelevant, if plaintiff can not show that, during the same

period, Centrilift permitted other similarly-situated employees to assemble pumps by hand unchastened.  Plaintiff proffers absolutely no evidence that Centrilift did so on or after June 9, 2005. In fact, the undisputed evidence shows that the manager elected to eliminate any future misunderstanding by requiring all employees in the mechanical assembly department, including plaintiff and Trahan, to sign a written understanding about the new pump assembly procedure.  See Dkt. # 55-7.

        As to the September 2005 final written warning that led to plaintiff's termination, however, the Court finds that plaintiff has raised a genuine issue of material fact.  Centrilift offers no explanation as to why management applied the normal disciplinary process to plaintiff but did not apply that process to a similarly-situated, Caucasian employee.  For example, plaintiff received a write-up for the HS&E violation in June 2005, a final written warning for the "hot pump" incident (insubordination) and teamwork issues in September 2005, and then was terminated in August 2006 for continuing teamwork problems.  Morland, on the other hand, received a write-up for the ethnic slur in September 2005, a write-up for his teamwork issues in August 2006, but no write-up at all for his July 2006 sheet incident.  Centrilift offers absolutely no explanation as to why Morland was not reprimanded for his donning of the white sheets; and it offers only a mildly cogent explanation as to why Frew, a new trainee, was not disciplined for his participation in the "hot pump" incident, see Dkt. # 43-2, at 6.  Therefore, because plaintiff has raised a genuine issue of material fact with regard to pretext, the Court concludes that summary judgment should be denied as to plaintiff's discriminatory discharge claim.

**B.  Hostile Work Environment**

The Tenth Circuit applies a three step test in analyzing a hostile work environment claim. The first step "is to determine if there is a genuine issue whether the acts [plaintiff] alleges are part of the same hostile work environment." Tademy v. Union Pac. Corp., 520 F.3d 1149, 1156 (10th Cir. 2008) (quoting Duncan v. Manager, Dep't of Safety, City & County of Denver, 397 F.3d 1300, 1309 (10th Cir. 2005)) (internal quotation marks omitted).  The alleged harassment must be "racial or stem[] from racial animus" and at least one of the acts must have occurred within the statutory filing period. Id. (quoting Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998)) (internal quotation marks omitted) (alteration in original).  The second step is to evaluate whether plaintiff "has presented evidence from which a reasonable jury could conclude that 'the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment.'" Id. at 1157 (quoting Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994)).  In making this evaluation, courts should consider the working environment "both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." Id. at 1162 (quoting Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007)) (internal quotation marks omitted).  Courts also should consider the frequency, severity, nature, and affect of the alleged harassment.  See id.  Courts should also bear in mind that "not all workplace conduct that may be described as harassment, affects a term, condition, or privilege of employment within the meaning of Title VII." Sprague v. Thorn Ams., Inc., 129 F.3d 1355, 1365 (10th Cir. 1997) (internal quotations marks and citation omitted).  The third step is to determine whether plaintiff has "presented evidence sufficient to give rise to a reasonable inference that [defendant]'s response was inadequate." Tademy, 520 at 1162.  Agency principles determine whether an employer is liable for

33

employee conduct that creates a hostile work environment.  Id.  An employer may be liable pursuant to three theories: "[1] the negligence theory, under which the employer fails to remedy a hostile work environment it knew or should have known about; [2] the actual authority theory, under which an employee harasses another employee within the scope of his employment; or [3] the apparent authority theory, under which the harassing employee acts with apparent authority from the employer."  Id. (quoting Hollins v. Delta Airlines, 238 F.3d 1255, 1258 (10th Cir. 2001)).

Here, the parties do not dispute the first step.  Therefore, the Court does not need to consider whether any of the conduct in question fell outside of the statutory period.  The parties do dispute, however, the second and third steps.  Plaintiff claims that his work environment was sufficiently severe or pervasive to alter his conditions of employment and create an abusive working environment.  Dkt. # 55, at 29, 33.  He claims that the following occurrences created this environment: (1) the two white sheet incidents, (2) the one utterance of the "N word," (3) the references to plaintiff as "boy," (4) the one comment about plaintiff's reading/spelling deficiencies, (5) the refusals by coworkers to assist plaintiff with tasks, (6) the preferential treatment Caucasian coworkers received in "job assignments and discipline," and (7) the failure by Centrilift to "take any corrective action to remedy this environment."  Id. at 29.  Plaintiff further claims that Centrilift is vicariously liable for this hostile work environment, because management actually knew or should have known about these incidents and yet took only minimal steps to prevent this abusive activity. Id. at 34-35.

Taking all of the hostile work environment factors into account, along with Centrilift's response and, again, drawing all reasonable inferences in plaintiff's favor, as the Court must, the Court finds that a reasonable jury could conclude that the harassment alleged by plaintiff was

sufficiently severe to alter the conditions of his employments and create an abusive working environment.  Plaintiff alleges a series of harassing acts, culminating in Morland's and Cook's donning of the white sheets.  While the Court finds that this is an exceedingly close case, it cannot ignore the genuine issues of material fact surrounding two sheet incidents that the lead expressly stated could be interpreted to be racially motivated, see Dkt. # 55-11, at 1.  The Court cannot discern, based on the cold written record, whether Cook's and Morland's conduct was merely horseplay or intentional and egregious acts of discrimination calculated to intimidate an African-American.  It is not possible to tell from this record if the white attire was cape-like ("Superman") or Klan-like (head cone).  Like a noose, the donning of items resembling traditional Ku Klux Klan attire "remains a potent and threatening symbol for African-Americans, in part because the grim specter of racially motivated violence continues to manifest itself in present day hate crimes." Tademy, 520 F.3d at 1162-63 (internal quotation marks and citation omitted).  The Court acknowledges that Morland's and Cook's stunts "may have involved no racist intent at all," but where there "may be legitimate arguments on both sides, these arguments should take place before a jury that will have the opportunity to evaluate the evidence, demeanor, and candor of witnesses." Id. at 1163.  Whether the alleged harassing acts were racially motivated and affected plaintiff's work environment are "quintessentially [] question[s] of fact." Id. (internal quotation marks and citation omitted) (alterations in original).  Therefore, the Court finds that plaintiff has presented sufficient evidence to satisfy the second step.

As to the third step, the Court "must make two inquiries: first into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment." Adler v. Wal-Mart

Stores, 144 F.3d 664, 673 (10th Cir. 1998).  An employer has actual knowledge when plaintiff has reported the alleged harassment to management.  Id.  An employer has constructive knowledge when, in the exercise of reasonable care, management could have discovered the alleged harassment. Id.  An employer's response is reasonable if it is "reasonably calculated to end the harassment."  Id. at 676.  Whether the harassment stops as a result of the employer's response is not the sole consideration.  Id.  "A plaintiff who argues that continuing harassment demonstrates the inadequacy of the employer's response must offer evidence of a nexus between a[n employer's] prior response and later harassment by others."  Tademy, 520 F.3d at 1166 (internal quotation marks and citation omitted) (alteration in original).  If the harassment does not stop, the courts must examine the adequacy of the response "in light of 'the timing of the employee's complaint, the speed of the employer's response, and the gravity of the punishment relative to the alleged harassment."  Id. (quotation omitted).

Here, the Court cannot resolve the adequacy of Centrilift's response on summary judgment. Regardless of the source, Centrilift management indisputably knew of: (i) plaintiff's May 2005 allegations of unfair treatment and racial issues, see Dkt. # 55-3, at 24-26, (ii) at least one employee's belief that plaintiff and a similarly-situated coworker had received differential treatment, see id. at 40, (iii) Morland's utterance of the ethnic slur, and (iv) the two sheets incidents.  While plaintiff admits that he did not alert management about coworkers' use of the term "boy" and the episode wherein coworkers poked fun at plaintiff's reading/spelling abilities, see Dkt. # 43-6, at 25, the Court finds that a genuine issue of material fact exists as to whether Centrilift management could have, in the exercise of reasonable care, discovered this other alleged  harassment.  Further, the Court finds that a genuine issue of material fact exists as to the reasonable nature of Centrilift's

response.  At bottom, Centrilift's efforts did not stop the alleged harassment.  The sheet incidents

occurred notwithstanding management's investigation of plaintiff's May 2005 "prejudice" claims

and reprimand of Morland for his use of the ethnic slur.  Similarly, and for reasons unbeknownst to

this Court, Centrilift management elected to discipline only Cook, and not Morland, for the sheet

incidents.  See Fullwiley v. Union Pacific Corp., 273 Fed. Appx. 710, 719 (10th Cir. 2008) ("We

acknowledge that in certain instances a company's failure to respond to such matters may support

a hostile work environment claim.").[13]  The Court finds, therefore, that plaintiff has proffered

sufficient evidence to withstand summary judgment; triable issues of fact exist as to plaintiff's

hostile work environment claim.

## C.  Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee because "[he]

has 'opposed' any practice made unlawful by Title VII, or because [he] has 'participated . . . in an

investigation, proceeding, or hearing under this subchapter.'"  Stover v. Martinez, 382 F.3d 1064,

1070 (10th Cir. 2004) (quoting 42 U.S.C. § 2000e-3(a)).  If an employee has no direct evidence of

retaliation, he must prove his claim using the McDonnell Douglas burden-shifting framework

discussed in Part III.A. above.

1.  Prima Facie Case

Plaintiff establishes a prima facie case of retaliation by showing that: (1) he engaged in

protected opposition about which the employer knew; (2) he suffered an employment action that a

reasonable employee would have found materially adverse; and (3) a causal connection exists

---

[13]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See
Fed. R. App. 32.1: 10th Cir. R. 32.1.

between the protected opposition and the adverse employment action.  Carney, 2008 WL 2838134,

at *6; Stover, 382 F.3d at 1071; Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004);

Petersen v. Utah Dep't of Corrs., 301 F.3d 1182, 1188 (10th Cir. 2002).  "An employer's action

against an employee cannot be because of that employee's protected opposition[,]" however, "unless

the employer knows the employee has engaged in protected opposition." Petersen, 301 F.3d at 1188

(emphasis in original).

Here, plaintiff has met his prima facie burden.  First, plaintiff engaged in protected

opposition.  He complained about his coworkers' alleged discriminatory conduct in his July 31, 2006

letter to Centrilift's president.[14]  See Dkt. # 55-12.  Plaintiff's informal complaints qualify as

protected opposition.[15]  Somoza v. Univ. of Denver, 513 F.3d 1206, 1213 (10th Cir. 2008); see

Hertz, 370 F.3d at 1015 ("Protected opposition can range from filing formal charges to voicing

informal complaints to superiors.").  Second, plaintiff suffered an adverse employment action.

Centrilift terminated plaintiff on August 14, 2006.  Fye v. Okla. Corp. Comm'n, 516 F.3d 1217,

1228 (10th Cir. 2008) ("[T]ermination . . . is clearly an adverse employment action."); Orr v. City

of Albuquerque, 417 F.3d 1144, 1150 (10th Cir. 2005) ("[A]dverse employment actions 'constitute[

] a significant change in employment status, such as hiring, firing, failing to promote, reassignment

---

[14]     Plaintiff appears to have abandoned his claim, asserted in his EEOC Charge of
Discrimination, see Def. Ex. W, that Centrilift terminated him in retaliation for his 2004
lawsuit.  In plaintiff's brief, he does not assert such an argument.  See Dkt. # 55, at 15, 26-
28.

[15]     Centrilift argues, without citation to authority, that plaintiff's letter does not qualify as
protected opposition to any unlawful practice because it does not use the explicit
terminology, "race discrimination."  Dkt. # 35, at 7.  Regardless of the precise language
contained in the letter, the Court finds that it clearly references behavior that the plaintiff
believed was discriminatory.

with significantly different responsibilities, or a decision causing a significant change in benefits.'" (quoting Stinnett, 337 F.3d at 1217)).  Third, a causal connection exists between plaintiff's letter to Centrilift's president and his termination.  Only two weeks elapsed between plaintiff's submission of his letter and his termination.  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001) ("A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" (quoting Burrus v. United Tel. Co. of Kan., Inc., 682 F.2d 339, 334 (10th Cir. 1982))).  This two week period is sufficient to establish a causal connection.  See Fye, 516 F.3d at 1228 (holding that a time span of "less than two weeks," alone, is sufficient to establish a causal connection between the protected activity and the plaintiff's termination); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (finding that a period of twenty-four days is sufficient to establish a causal connection); O'Neal, 237 F.3d at 1253   ("[A] one and one-half month period between protected activity and adverse action may, by itself, establish causation." (internal quotation marks and citation omitted)).  Moreover, to the extent Centrilift argues that no causal connection exists because the manager did not know of plaintiff's letter, see Dkt. # 60, at 14, the Court finds that Centrilift misconstrues the manager's deposition testimony.  The manager did not state that he did not know of the letter or its details.  See Dkt. # 43-9, at 6.  He merely stated that he did not recall having "seen" the letter.  See id. Therefore, at a minimum, there is a genuine issue of material fact as to whether the manager knew of plaintiff's letter when he made his termination decision.

2.  Legitimate, Nondiscriminatory Reason

At this stage, the employer need not rebut evidence presented under the first step.  The employer must rebut only the inference that it acted out of discriminatory animus.  E.E.O.C. v.

Flasher, 986 F.2d at 1318.  The ultimate burden of proving discrimination remains at all times with

plaintiff.  Burdine, 450 U.S. at 253.  If the employer carries its burden of production, the

presumption of discrimination drops out of the case.  Hicks, 509 U.S. at 510-11.

Here, for the reasons set forth in Part III.A.2 above, the Court finds that Centrilift has

articulated a legitimate, nondiscriminatory reason for its termination decision.  Thus, the burden

shifts to plaintiff to show that Centrilift's stated nondiscriminatory reason is mere pretext for

unlawful retaliation.

3.  Pretext

To show pretext, plaintiff must produce evidence: (1) "that a discriminatory reason more

likely motivated the employer," or (2) "that the employer's proffered explanation is unworthy of

credence."  Jencks v. Modern Woodmen of Am., 479 F.3d 1261, 1267 (10th Cir. 2007).  Plaintiff

may provide evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did not

act for the asserted non-discriminatory reasons."  Morgan, 108 F.3d at 1323.  While "all doubts

concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat

summary judgment."  Id. at 1324.  "Mere conjecture that the employer's explanation is pretext is

insufficient basis to defeat summary judgment."  Anderson, 181 F.3d at 1179.

The pretext analysis is the same for retaliation as it is for discriminatory discharge.  See e.g.,

Vaughn v. Villa, ___ F.3d ___, 2008 WL 3843340, at *5 (10th Cir. Aug. 19, 2008) (applying the

McDonnell Douglas pretext analysis); Somoza, 513 F.3d at 1211 (applying same).  For the reasons

set forth in Part III.A.3 above, namely that plaintiff has raised a genuine issue of material fact with

regard to disparate discipline, the Court finds that summary judgment should be denied on plaintiff's retaliation claim.

## IV.

Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.  See, e.g., Gaylord Entertainment Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46. Id.  In Breeden v. League Services Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained,

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'  The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376.  "While emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea, it is only where the emotional distress is extreme that liability arises."  Computer Publ'ns, Inc. v. Welton, 49 P.3d 732, 736 (Okla. 2002).

A plaintiff alleging intentional infliction of emotional distress must establish the following elements: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe.  Trentadue v. United States, 397 F.3d 840, 856 (10th Cir. 2005) (applying Oklahoma law);  Welton, 49 P.3d at 735.  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be

41

reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." Trentadue, 397 F.3d at 856 n.7.  If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the court should submit the claim to the jury to determine whether the defendant's conduct could result in liability.  Id. The court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress.  Id.

The Court finds that plaintiff has no evidence that would support a claim for intentional infliction of emotional distress.  The summary judgment record does not show that Centrilift engaged in extreme or outrageous behavior, or that plaintiff suffered severe emotional distress.  Case law sets a high standard for finding that the workplace is so severely contaminated with hostility that a defendant will be found liable for engaging in extreme and outrageous behavior.  Merrick v. N. Natural Gas Co., 911 F.2d 426, 432-33 (10th Cir. 1990) ("Insubordination, yelling, hostile reactions and the hurt feelings naturally accompanying such conduct do not give rise to a cause for intentional infliction of emotional distress.  We hold that Roberts and Merrick were involved in an ordinary employer-employee conflict"); Anderson v. Okla. Temp. Serv., Inc., 925 P.2d 574 (Okla. 1996) (sexually explicit comments at work were not extreme and outrageous because they were tolerated by plaintiff and other employees within the office setting); Eddy v. Brown, 715 P.2d 74 (Okla. 1986) (repeated insulting actions by other employees and supervisors that caused emotional harm were not so severe or pervasive in the setting in which they occurred to justify submitting claim to jury).  Quite simply, Centrilift's work environment was not so severe or outrageous as to give rise to severe emotional distress.  While admittedly inappropriate, insensitive, and immature, the conduct that occurred in the workplace was not – without more – "beyond all possible bounds of decency in the setting in which it occurred."  Miner v. Mid-America Door Co., 68 P.3d 212, 223 (Okla. Civ.

App. 2002) (internal quotation marks and citation omitted).  The Court concludes, therefore, that Centrilift's motion for summary judgment should be granted as to plaintiff's claim for intentional infliction of emotional distress.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Combined Brief in Support (Dkt. # 43) is hereby **granted in part and denied in part**: it is granted as to plaintiff's intentional infliction of emotional distress claim; it is denied as to plaintiff's discriminatory discharge, hostile work environment, and retaliation claims.

**DATED** this 26th day of August, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT